WILLIAM R. DUDLEY et al., Appellants, v. S. MARGARETHA R. CLARK.

Division One, March 3, 1914.

1. **LIMITATIONS: Pleading.** A general denial is sufficient to invoke any special or general statute of limitations as a defense in ejectment; and a plea of the thirty-year statute will not amount to a waiver of the ten-year statute where there is a general denial.

Dudley v. Clark.

2. ———: **Against Church Trustees.** Sec. 1886, R. S. 1909, declaring that "nothing contained in any statute of limitation shall extend to any lands given, granted, sequestered or appropriated to any public, pious or charitable use, or to any lands belonging to the State," was intended, among other things, to preserve lands given, granted, sequestered or appropriated to a charitable use to that use; it was not intended to be a weapon in the hands of heirs or others to prevent the acquisition of land for a pious or charitable use by adverse possession and limitation. It is not available, as against the purchasers from the trustees of a church, to persons who sue in their own individual right on a bare legal title which they claim was cast upon them by descent as heirs of their ancestors, who, they claim, bought it with their own money, though they were themselves trustees at the time the property was purchased for church uses and deeded to them. The statute is meant to aid a church or other pious use to hold its lands in spite of other statutes of limitations; not to forbid it gaining title by limitations.

3. ———: ———: **Suing as Individuals: Recovering as Trustees.** Plaintiffs cannot ask for possession of land as heirs in their individual right, and get possession as trustees; and hence, they cannot invoke the doctrine that, as to an express trust, the Statute of Limitations, as between *cestui que trust* and trustee, does not run in favor of either (as against the other), for it is wholly inapplicable where plaintiffs do not sue as trustees and never were such.

4. ———: **In Favor of Church Trustees.** Continuous, open and adverse possession of church property by trustees appointed by the church according to its uses, for the statutory period, established title in them by limitations. Nor does the fact that members of the church society shared permissively in the possession, as contemplated by the trust, militate against the possession of the trustees or operate in favor of those who claim through a paper title. Nor is it any of the concern of such claimants that there were irregularities in the appointment of the trustees, who accepted their appointment and were recognized as such by the society electing them, and by their authority and direction sold the property to defendant.

Appeal from Audrain Circuit Court—*Hon. James D. Barnett,* Judge.

Affirmed.

*Robertson & Robertson* for appellant.

(1)    Under and by virtue of the terms of the deed from Barnett to plaintiff's ancestors, and from the fact that the grantees in said deed furnished the purchase price for the land, the grantees took a title in fee simple to said lands.    Draper v. Minor, 36 Mo. 290. Independent of the fact that plaintiffs' ancestors paid for the land with their own funds and were never repaid by the church, the title to the lands, upon the death of the trustees named in the deed passed to the plaintiffs as heirs of the said trustees.    Ewing v. Shannahan, 113 Mo. 188; Hook v. Dyer, 47 Mo. 214; Newman v. Newman, 152 Mo. 409; Underhill on Trusts and Trustees, 383; Hill on Trustees (Am. Notes), 442; Schenck v. Schenck, 16 N. J. Eq. 174; Perry on Trusts (5 Ed.), sec. 341.    (2) Under the terms of the deed from Barnett to Pearson, Dudley and Ward, the property was devoted to religious worship for the Davis Fork Baptist Church.    That means, as a matter of course, so long as that church organization should use the property for that purpose and so long as the property should be used for church purposes.    During the time that the property was used for church purposes it was sequestered or appropriated to public, pious and charitable use and under the terms of section 1886, the Statute of Limitations would have no operation.    Strother v. Barrow, 246 Mo. 241.    "It is well settled that a subsisting recognized and acknowledged trust, as between the trustee and *cestui que trust* is not within the operation of the Statute of Limitations." Wood on Limitations (3 Ed.), sec. 200.    The common source of title in this case is Thomas Barnett.    He conveyed the land to certain persons, to be used for a church house.    This voluntary society or church congregation used this property with the consent of the grantees.    It is fundamental that as between the trustee and the beneficiary, the Statute of Limitations does not apply.    Perry on Trusts, secs. 863-864; Wood

on Limitations (3 Ed.), sec. 203; Buren v. Buren, 79 Mo. 538. The use of the property by the congregation was not adverse to the grantees or their heirs, but was held by and with their consent and for the purposes named in the deed, and it was in no sense an adverse holding. The church organization or congregation not being incorporated had no legal entity. It could not sue or be sued and of course it could not gain rights which it could assert against the owners of the property by limitation or otherwise. Riffe v. Proctor, 99 Mo. App. 607.

ı    *Fauntleroy, Cullen & Hay* and *Barclay & Orthwein.*

The testimony in this case shows that A. F. Dudley died in 1875, that Pearson died in 1880, and that Ward went to California prior to 1880 and ceased to be a trustee in October, 1880, and died in 1883. It is therefore clear that their heirs are barred by limitation. Other trustees were appointed and they had the actual possession of the property, claimed it as their own, and the congregation also claimed it, and for thirty years the rights of these plaintiffs were openly defied. These plaintiffs never acted as trustees, never claimed to act as trustees, and the relation of trustee and beneficiary never existed between them and the congregation, and even now they do not sue as trustees. The title to the land in controversy in this case was claimed by the succeeding trustees and by the congregation for more than thirty years, and in such case adverse possession confers title. Baptist Church v. Harper, 77 N. E. 778; Church v. Schoolcraft, 65 N. Y. 145; University v. Church, 65 Atl. 398; Perry v. Coal Co., 138 Fed. 769; 2 Devlin on Real Estate, p. 1414; Phelan v. Brady, 119 N. Y. 587, 8 L. R. A. 211; Randolph v. Meeks, Mart. & Y. 58; Macon v. Sheppard, 2 Humph. 335; School District v. Taylor, 19 Kan. 287; Everts v. Rose Grove, 77 Iowa, 37, 14 Am. St. 264.

LAMM, J.—Plaintiffs (as heirs of a group of church trustees, as presently appears) sue in the Audrain Circuit Court in two counts, one in ejectment and one under former section 650 to quiet title—the property in dispute being lot one of block eighteen in the town of Mexico in Audrain county. There were two defendants, one was dismissed and the answer of the other, S. Margaretha R. Clark, is first a general denial, then she pleads her own title and follows that by a plea of the thirty-year Statute of Limitation, and title by limitation under the "general laws" of Missouri, averring, among other things, that "she and those under whom she claims have been in the open, notorious, exclusive, actual and adverse possession of said land for forty years." The prayer of her answer was that the court "adjudge and decree that she has the title to said land and that the defendants (sic) have no interest in said land, and are not entitled to the possession thereof." (*N. B.*: Evidently "defendants" is a misprint for *plaintiffs.*)

The reply put at issue new matter.

On a trial to the court without a jury "all the issues" were found in favor of defendants (the clerk failing to note that one of the defendants had been dismissed) and the following judgment was rendered on that finding:

"It is therefore considered, ordered and adjudged by the court t''·⁴ plaintiffs take nothing by their writ, and that defendants go hence without day, and have and recover of and from the plaintiffs, as well as George Pearson, surety on cost bond, the costs herein laid out and expended, and that execution issue therefor."

It will be observed that though such finding would have supported a decree of title as prayed in defendant's answer and in the second count of plaintiffs' petition, yet the court stopped at the bare general finding and entered no affirmative decree ascertaining

Dudley v. Clark.

and determining the estate or interest of the respective parties to the suit in the real estate as is contemplated by Section 650, Revised Statutes 1899. That is, it ignored the requirements of that section. [Armor v. Frey, 226 Mo. l. c. 663 et seq.] Respondent filed no motion for a new trial. Resting content with that judgment, she took no appeal and in her brief here her counsel contend that the second count of the petition was practically abandoned by plaintiffs. Plaintiffs in turn in their brief in reply do not take issue on that contention but, as we grasp it, present questions here, as they did below, in such a way as to lend color to that view of it. Hence, without deciding the particular point of abandonment, we think on the premises stated that the appeal may be well ruled as if the second count of the petition fell out of the case, and that the count on ejectment stood alone to be reckoned with. Accordingly, for appellate purposes, the cause may proceed as if that were so.

Defendant asked no instructions. Plaintiffs asked two which were refused. If the facts entitled plaintiffs to recover then these instructions should have been given. Otherwise, otherwise. In that view of it the instructions need no further attention and will not be reproduced.

Attending to the facts, the case is this: Many years ago in the first half of the last century the members of that great denomination in the United States looking to Roger Williams as its mentor and founder were much agitated by theological dogmas relating to the doctrines of election and predestination, some taking such an ultra-conservative view of those questions as precluded the wisdom of Sunday schools, missions, etc. They were known as Primitive Baptists. In some way they got the name of "Hardshells" which (given at the outset facetiously to indicate lack of expansiveness) has become, as not infrequently happens, an allowable historical name. [*Vide* tit., "Baptist," Web.

New Internat. Dict.] That agitation caused a schism in the Baptist family in Audrain county as elsewhere. At some time before 1853 the Hardshell or Primitive Baptists, as distinguished from the main body, to-wit, the Missionary Baptists, organized a society known as the Davis Fork Regular Baptist Church and, in the name of certain trustees, to-wit, Pearson, Ward and *Poage,* took title from one Harrison and wife Rebecca to lot eight, in block sixteen, in the town of Mexico —the *habendum* of that conveyance reading: "To have and to hold the above designated lot of land for the uses and benefits of the said Davis Fork Church and meeting house so long as the church continues to hold the doctrine of election and predestination, and the said James and Rebecca Harrison do forever warrant and forever defend the right and title to the aforesaid lot of ground to the aforesaid trustees or their successors in office for the use and benefit of the said Davis Fork Church against the lawful claim or claims of all and every person whatsoever."

In 1873, preparatory to a sale, and the acquisition of a new situs and building another meeting house, the grantor in the foregoing deed made a quitclaim of the lot to the same trustees in which the above conditions were referred to and the grantor formally by apt narration released the grantees as trustees from them for an expressed nominal money consideration. Whether trustee Poage died, was removed or what became of him we do not know, but on a certain day in March, 1873, trustees Pearson and Ward, on behalf of the church, and one Dudley (who also executes as a trustee of the Davis Fork Baptist Church) made a deed with general clauses of warranty to one Evans of part of lot eight, in block sixteen, in the town of Mexico. It is not clear what form of deed was made to the other part of the lot, but evidently it was sold and conveyed by the same trustees (leaving out Poage and including Dudley) at about the same time. As we make out, the

son of Pearson, trustee, purchased it and trustee Pearson went his security for the payment. We think so because of the testimony from one of plaintiffs' witnesses, Pearson (another son of the trustee by that name), to-wit:

"I remember the property was sold down there about the time they built the new church. My brother bought part of it and my father paid for it. It was sold on credit. My brother bought some of it and I think my father went his security. I don't think my father bought any, I am not sure; he might. If he bought any of the first tract from the trustees I do not know it, I don't remember it at all. John V. Pearson bought some of it and John A., my father, if he bought any I don't know.

"The old church split up over the missionary cause, when they were worshipping at Hopewell, and my father and several others withdrew from that church and browsed around the best they could until they got able to build another one."

So, too, we find that in August of that year, 1873, a report spread on the church record is made by a committee "appointed to sell the old meeting house and grounds and erect a new one," which committee, on the coming in of that report, was discharged. That report shows the amount realized on the old house and lot (the whole lot) was $1,056.40. We will recur to this report again. Going back a little: Prior to that time, in March of that same year, one Barnett sold and conveyed to Pearson, Dudley and Ward, trustees for the Davis Fork Baptist Church, in consideration of $300 paid, lot one in block eighteen of the town of Mexico (the land in dispute). This conveyance was in the form of a quitclaim deed. It had no condition precedent or subsequent, no clause of reverter, and its *habendum* ran to "said parties of the second part" (to-wit, Pearson, Dudley and Ward as trustees for the

Davis Fork Baptist Church) "and their successors forever." The transfer by the same trustees of part of the old lot to Evans seems to be simultaneous with the acquisition of the new lot from Barnett.

As it is contended by appellants that trustees Dudley, Ward and Pearson paid the consideration for the Barnett conveyance out of their own pockets and *that it was never repaid to them,* let us look to that. The testimony relied on to establish that ancient fact we will not reproduce for it is anything but certain, definite or cogent. Much of it is in the nature of hearsay, or inferences or conclusions. There is no attempt to show the whole transaction in its details. No records or books of account were introduced tending to show such fact. No witness who participated in the transaction as an actor testified to it as of his personal knowledge. The only bit of substantial evidence tending to show the payment fell from the lips of one of the sons of the original trustees named in the Barnett deed, Pearson, who saw his father count out $125 to pay for the lot and who testified that the lot was paid for sometime before the church had disposed of its old meeting house and grounds. He had seen, he says, an old contract in his father's hands (which his father threw away as worthless) relating to such purchase, but we think the testimony conclusively shows that either at that time or shortly thereafter the Barnett lot was paid for out of the sale of the old grounds or subscriptions. We say so because in August, 1873, at the time the sale and building committee was discharged, several significant things happened as shown by the church records, to-wit: Mr. Pearson, the very trustee whose son testified his father had paid $125 on the lot and who seems to have been chairman of the building committee and the chief manager, made a report to the congregation which purported to cover the whole matter of acquiring the new lot and building the new church and of disposing of the old church and

lot. In that report he states that the old house and
lot sold for $1056.40; that the amount realized to date
on subscriptions was $1419.55; that the entire cost of
the (new) house, fixtures, lot, fencing, painting, etc.
was $2769. 09; that deducting therefrom cash realized
from the old house and lot, and that collected on sub-
scriptions left a balance of $346.14; that the cash on
hand was $26.50 and the balance due on the transaction
was $319.64. Now at that same church meeting, when
the committee was discharged, trustee Pearson was au-
thorized to ''borrow'' money to pay the balance ''due
for *house*," i. e., the *new* house, and execute his note
''on behalf of the church'' for the same, and further-
more a Mr. Rothwell was appointed ''to collect bal-
ance due on subscription list and when collected to
hand it over to John A. Pearson for payment due on
the house.'' There the story from the church record
ends in 1873. Whether Pearson executed that note
for borrowed money to pay the balance due on the
*house* and whether Rothwell collected enough on sub-
scriptions to pay that balance we do not know, but it
is apparent enough that Pearson, trustee, in his re-
port makes no claim of indebtedness to himself per-
sonally for having paid for the church *lot* at some
prior time. He seems to have handled the cash real-
ized from building subscriptions and from the sale
of the old property. He seems to have been security
for his son for the purchase price of part of the old
lot and had full opportunity to recoup any advance-
ments made by him and his cotrustees on the purchase
of the lot. It is clear, also, that no claim thereafter
was made on that behalf by anyone at any time and
the presumption is, we think, that such debt, if exist-
ing, was satisfied through opportunities, ways and
means this record shows then existed. If anything is
lacking to justify that conclusion it is supplied by the
testimony of appellants' chief witness as follows,
speaking of the three trustees who took title to the

lot now in dispute, *viz.*: "Those three men took their own money and paid the $300 for this property, *with* *the expectation of getting it back when the property was sold*—the old church property." Where there is a will there is usually a way. Where opportunity and disposition meet results are bred. With that "expectation" and with the means of realizing it potentially in their hands and with the subsequent silence of many lustrums we can not decide this case on the theory that the facts show that those trustees, Ward, Dudley and Pearson, paid for the lot out of personal means and were never reimbursed.

Coming to another phase of the case, the record shows that trustee Dudley died in 1875 while on the road to California to make a new home; that trustee Ward died in California in 1883, having become a resident of that State and that his estate was settled there. It shows furthermore that in 1880 he took a letter of "dismission" from the Davis Fork Baptist Church. Trustee Pearson died in 1880 while a member and trustee of the church.

Plaintiffs are the heirs and descendants of Dudley, Ward and Pearson, those trustees. They claim title by descent cast, as individuals and not as trustees.

As bearing further on Baptist church usages and customs, it is shown that in 1880 one McGee at a congregational meeting was dismissed as trustee and one Conger appointed; that in 1893 one Price was appointed at a like meeting to fill a vacancy in the trustees; that in 1898 by a like meeting one Palmer was elected trustee to fill a vacancy; that in 1899 one Huff was elected trustee in the same way to fill a vacancy; that in 1901 one McCully was elected in the same way to fill a vacancy caused by the resignation of Price, trustee; so in 1903 one Bradley was elected to fill a vacancy caused by the removal of Palmer and one Clark was chosen to fill a vacancy caused by the removal of Huff.

There were a written constitution and by-laws of the Davis Fork Baptist Church offered in evidence, but they have not been abstracted. Whether they pre-scribed rules for holding and conveying church prop-erty we do not know. But historically we know and the record in this case shows that Baptist churches are strictly democratic bodies. The oral testimony shows that "they recognize no authority on earth above the individual church. Each church is supreme in itself" and has what is "known as the congrega-tional method of organization."

In 1905 the question of selling the property in dis-pute and buying another lot to build on was considered in a church meeting and a committee was appointed to investigate and report, but the matter seems to have fallen through and was not pursued at that time. In the course of time the church building, which was of brick and built in 1873, was out of repair and was, we infer, of little or no value. The lot, however, had be-come valuable for business purposes and the town was putting expenses upon the property for sidewalks, street pavements, etc. The membership of the church had dwindled by death, removals and dismissions, serv-ices were never abandoned but in late years were spo-radic and the society as a factor in the moral ameli-oration of the town of Mexico had become a vanishing equation. So hard put to was the congregation that it became necessary in 1907 to borrow, by a deed of trust on the property, several hundred dollars to pay for paving the street in front of the lot. This trust deed was executed, as other church conveyances had been, by the then acting trustees on the vote of the members at a meeting of the society. Finally in March, 1909, at a meeting of all the remaining members, res-olutions were adopted, and spread of record, to the effect that the then trustees as successors of the orig-inal ones sell the property. Presently by a deed nar-rating those resolutions and pursuant thereto the

property was conveyed to defendant for a cash consideration of $2900, subject to said deed of trust. The terms of these resolutions and of the pursuant deed will not become material until, if ever, we get by the question of plaintiffs' title and reach that of defendant's, hence are omitted for the present.

Over the objection of defendant, who had no part or parcel in the transaction, plaintiffs were allowed to show that the present members of the society known as the Davis Fork Regular Baptist Church divided the purchase price share and share alike among themselves. Defendant was put in possession under her deed and on December 1, 1909, the heirs of the trustees who originally took title instituted this suit with the result hitherto noted.

The whole trend of the testimony is to the effect that the trustees, as reorganized from time to time by filling vacancies by the vote of the meetings of the society, had continuous control of the church build-ing and grounds, claimed title and held possession openly and adversely as of right for church purposes at all times since the original trustees severed their connection with the society by death or removal. It further tends to show that the plaintiffs or none of them at any time after the death or removal of their respective ancestors claimed any right of possession or title or exercised any acts of ownership over the property until they brought this suit nearly thirty years after the last of the original trustees died. Plaintiffs made no attempt to show that anything in the usages, customs, constitution or by-laws of the Davis Fork Regular Baptist Church or any other Baptist congregation militated against appointing successors to trustees in case of death or removal, or against such acting trustees conveying on the vote authority and demand of the congregation interested. In this case, so far as the history of the title to any real estate of the Davis Fork Regular Baptist Church is

concerned, that course had been adopted from time to time, as of course, without a murmur of dissent, and until this case was brought has always been acquiesced in by all concerned.

In view of such record we are of opinion that the judgment below must be affirmed. Because:

I. *Of adverse possession and limitations.*

(a) It is contended for respondent that adverse possession and limitations are a complete defense; *contra* for appellants that respondent having pleaded the thirty-year and not the ten-year statute, the facts do not bring the case within that of thirty years, hence that of ten years can not be invoked. Is there substance in that view? We think not, because:

Granted that respondent pleads the thirty-year statute of limitations and granted that the facts do not bring the case strictly within the purview of that statute, but looking further we find the answer also pleads title by limitations under the "general laws." In that view of it if a plea were necessary the plea, scant as it is, is present. However, no plea of the general (or any special) statute of limitations was necessary to invoke its aid in ejectment. Defendant may raise such defense under a general denial when such denial is present in the answer, as here. [Nelson v. Brodhack, 44 Mo. l. c. 600 et seq.; Coleman v. Drane, 116 Mo. 387; Stevenson v. Smith, 189 Mo. l. c. 466; Bird v. Sellers, 113 Mo. l. c. 587 et seq.; Collins v. Pease, 146 Mo. l. c. 139.]

If it were to be conceded to counsel that there was a plea of the thirty-year statute and none of any other, yet such concession would not avail them as a waiver of the ten-year statute in the face of the general denial, which raises the issue of itself in ejectment.

(b) There is a statute, section 1886, Revised Statutes 1909 (apparently borrowed from Vermont), which took effect August 1, 1866, reading:

"Nothing contained in any statute of limitation shall extend to any lands given, granted, sequestered or appropriated to any public, pious or charitable use, or to any lands belonging to this State."

It is argued for appellants that a proper construction of that statute precludes the defense of adverse possession. Is there substance in that view of it? We think not, because:

In ejectment a plaintiff must recover, if at all, on the strength of his own title, hence plaintiffs must show a legal title in them or be cast. Hence the question at this stage is narrow, to-wit, whether appellants, if they ever had legal title, lost it by adverse possession and by the Statute of Limitations? Respondent's counsel say if appellants ever had the bare legal title by descent cast from their ancestors, the original trustees (which they deny), they lost it to respondent's grantors by adverse possession. Appellants in reply point to the foregoing statute and say it shuts out the contention. As to that we say: If actual trustees were suing to preserve a pious or charitable use another question would be here. If appellants were suing and contending that as mere heirs of the original trustees a legal title was cast upon them so that they stood charged in equity with a pious or charitable use for the members of the Davis Fork Baptist Church as beneficiaries, then that feature would have to be considered in connection with the question of the form of the action and the other question whether they or the trustees appointed by the Davis Fork Baptist Church congregation were the "successors" of the original trustees and entitled to possession. But these appellants are not in court on any such theory or capacity. They sue in their own individual right on a bare legal title which they claim was cast upon them in their own individual right by descent as heirs of their ancestors. They ask no possession on behalf of the members of Davis Fork Baptist Church as bene-

ficiaries. They lay no claim to the right to represent
the church or its members. The position of their
learned counsel is that the pious use has been di-
verted, abandoned, and consequently that they, as
heirs, have title and the right of possession to the
property as their own. On that contention we ob-
serve: The statute they invoke was intended, *inter
alia,* to preserve lands given, granted, sequestered or
appropriated to a pious or charitable use to that use.
It was not intended to be a weapon in the hands of
heirs or others to prevent the acquisition of land for
a pious or charitable use by adverse possession and
by limitation. A close and discriminating reading of
it makes it clear that it was not leveled at that angle
of the matter, and the reason of the thing, as well as
the history of the statute and the mischiefs to be pre-
vented thereby, conclusively corroborate that view of
it. Prior to that statute this State had through its
statutes adopted the public policy of allowing the lim-
itations to run agains the State and municipalities.
It was found to be a ruinous public policy; for under
it school lands, roads, parks, streets, etc., were lost
to the State and public through the laches or ignorance
of the public or of officials representing it. Is it not
learned at the fireside, that what is everybody's busi-
ness is nobody's business? To put a stop to that
mischief was one of the main objects of that statute.
While about it, however, the lawmaker included in his
law lands granted, sequestered or appropriated (not
only) to any public, (but to any) pious or charitable
use as well as lands belonging to the State, because
such lands were peculiarly subject to mischiefs aris-
ing from the invasions of those who itched for them
and got footholds upon them by inching over on them
by stealth, or appropriating them by covin or other
form of wrong and finally ripening a title by effluxion
of time. It is common learning that the law favors
pious and charitable uses as well as public uses, and

it is clear that the statute was passed in furtherance of that idea and not for the protection of those standing in the position of these appellants who, as said, sue in their individual right for themselves and not on behalf of the use. Take a case: Property used by a railroad company as a right of way or for depots is devoted to a public use and is protected by 'the statute. [Kansas City & N. C. R. R. Co. v. Baker, 183 Mo. 1. c. 324 et seq.] Would it not be a startling proposition to hold that because of that statute directed against *losing* land by limitation such railroad company could not *acquire* title by limitation? Or that the trustees of a church, school or hospital could not acquire title by limitation because of the same statute? Respondent's counsel cite us to cases holding that title may be acquired by prescription for charitable, pious, and public purposes. But as appellants cite us to none *contra,* we shall not quote from respondent's, but put our ruling on the intent of the lawmaker as gathered from the language of his statute, and the reasons for its enactment.

That the spirit of the law is the main thing in good exposition, that the intent of the law is the life of the law, its soul, and that if courts do not seek that intent out and enforce it they miss their prime and most august function are good doctrines. [Keeney v. McVoy, 206 Mo. 1. c. 65 et seq.; Perry v. Strawbridge, 209 Mo. 621; State ex rel. Waller v. Trustees of William Jewell Colege, 234 Mo. 1. c. 313 et seq.]

It was once the fashion in court and out to refer to statutes of limitations much the same way that polite folks now refer to their bowels, to-wit, only by way of derogation and complaint, but that day is long since over and gone and those statutes are now justly esteemed as highly salutary. [Wetmore v. Crouch, 188 Mo. 1. c. 652 et seq.] To deny their aid in the acquisition of title by church organizations unless inexorably driven to that conclusion by a statute di-

rected to that end (and leaving no loophole of escape) would be as invidious as ,unnecessary. The statute is directed to a charitable use holding its lands in spite of limitation, not to forbidding it gaining title by limitation.

(c)  To defeat the force of the Statute of Limitations, appellants also invoke the doctrine that the statute, as between *cestui que trust* and trustee, does not run in favor of either (as against the other) in an express trust. But before that doctrine could be applied in their aid we would have to hold the relation existed and that appellants in the eye of the law were trustees of an express trust. That we are not willing to do on this record—nay more (as we have held) they do not sue in that capacity or right. Ever since the old case of Esau v. Jacob it has been allowed as just that the asking voice should really belong to the getting hand. Are we to hold they may *ask* possession as *heirs* in their individual right, and *get* possession as *trustees?* If so are they trustees by inheritance, trustees *de facto,* or *de jure,* trustees by Baptist usage or custom, trustees by contract, by implication, or by election (or predestination) or how? It would be to reject substance and deal with shadows to reason out a trusteeship for appellants on the facts before us. So, scattered to the four winds, they never met as trustees, or for one moment acted as such or in one instance claimed the right to do so. For nigh thirty years they, without lifting a finger of protest, saw others chosen to that function and filling it acceptably to the beneficiaries of the trust. In the face of such implied repudiation of the duties of trustees it is idle for them to masquerade in that name in suing for real estate they claim in their own right by inheritance as heirs. No respectable authority can be found for that position and I think none ever will be found so long as the law lays stress on reason, or runs on all-fours

with good sense and fair dealing between man and man.

So that if the facts show that appellants by limitation lost their naked legal title, if any they had, to the actual trustees of the Davis Fork Regular Baptist Church (which question we take next) there is nothing in the pleadings, nothing in the foregoing statute or in the relation of trustee to *cestui que trust* in the way of the affirmance of the judgment.

(d) The record conclusively shows that the trustees selected from time to time by the members of the Davis Fork Regular Baptist Church were in possession of the real estate since 1880 when Pearson, the last resident original trustee, died. That the members of that church society shared permissively in the possession, as contemplated by the trust, in no way militates against the possession of the trustees or operates in favor of appellants. It was *res inter alios acta* as to them. That the possession of such trustees was continuous, open and adverse as to these appellants and the whole world save the church members, can not be gainsaid under the proof. They did not take or hold by appellants' permission or in subordination to their rights. That it was peaceable and under a claim of right is plain enough.

Under the Constitution of 1865, art. 1, sec. 13, trustees for a religious society or congregation, though unincorporated, could hold title to church property. [Boyce v. Christian, 69 Mo. 492.] The case is a typical one for the application of the Statute of Limitations as against appellants and in favor of respondent's grantors and we so rule. If, then, appellants ever held a legal title it was lost to them.

It is not clear how the regularity of the several appointments of the successors to the original trustees is any concern of appellants who are nonmembers of the church or has anything to do with this phase of the case as suggested by them. But, if open to in-

vestigation, it would have to be held under this record, absent proof to the contrary as here, that prima-facie and presumptively their several appointments were regular and in accordance with Baptist usages. Individuals and officials are presumed to perform their duties and engagements, act regularly and lawfully until such time as those who deny the fact overthrow such presumption by proof. [McCallister v. Ross, 155 Mo. l. c. 94; Hartwell v. Parks, 240 Mo. l. c. 544 et seq.]

There are cases cited by respondent's counsel from this court dealing with Baptist usages and the right of trustees to possession, holding reasoning and announcing conclusions supporting those reached in this paragraph. [Fulbright v. Higginbotham, 133 Mo. 668; Turpin v. Bagby, 138 Mo. 7.] And the curious may consult other cases cited by counsel buttressing the conclusions announced. [Christian Church of Sand Creek v. Church of Christ of Sand Creek, 219 Ill. 503; First Baptist Church of Sharon v. Harper, 191 Mass. 196.]

II. *Of other questions raised.*

There are nice questions discussed in briefs that will not be reached or ruled by us. For instance, it is suggested on one side and denied on the other:

(1)   That the original trustees were trustees of a mere dry trust which was automatically executed by the statute of uses in favor of the church members, the beneficiaries, and that the legal and equitable title united in such beneficiaries in 1873 at the date of the Barnett deed.

(2)   That the trustees paid their own funds to Barnett for the lot and were never reimbursed, hence the case of Draper v. Minor, 36 Mo. 290, controls the title and the right of succession. (Note: That phase of the matter has been considered in the opinion. The Draper case has never been cited as an authority from that day to this and we must not be considered as approving or disapproving it.)

(3) That respondent has no title because (it is claimed) her deed is void as a conversion of property devoted to a charitable use, because the conveying trustees were not duly appointed and because the title was in appellants.

(4) That the original trustees took a life estate only.

(5) That trustees as such can have no heirs.

The case having broken on the Statute of Limitations, and appellants having lost any legal title they ever had, it is not necessary for us to say whether they really had any by descent cast as heirs, or pass on the strength of respondent's title or on any other question outlined above. They are reserved for decision in some case riding off on them; for, as put in the opera, like "The flowers that bloom in the spring," they "have nothing to do with the case," as presented in this record and disclosed by the form of the judgment.

Let the judgment be affirmed. It is so ordered. All concur.