ALBERT A. LEWIS ET AL., Appellants, v. J. A. BRUBAKER ET AL.—14 S. W. (2d) 982.

Division Two, March 2, 1929.

54

*Marcy K. Brown* and *Marcy K. Brown, Jr.*, for respondent.

*Meservey, Michaels, Blackmar, Newkirk & Eager, Wilfley, Williams, McIntyre & Nelson, Johnson, Lucas & Graves* and *Daniel C. Ketchum* for respondents.

WALKER, J.—This is a suit in equity brought in the Circuit Court of Jackson County April 16, 1924, to declare void a deed made April 30, 1866, by R. J. Lewis and A. A. Goodman, to trustees, therein named, of the Grand Avenue Methodist Episcopal Church. The property conveyed is located on the corner of Grand Avenue and Ninth Street, Kansas City, and is described as lots numbered 109 and 110, Swope's addition.

Upon a trial to the court in March, 1925, there was a judgment for the defendants, from which the plaintiffs have appealed.

The plaintiffs sue as the heirs and the grantees of certain heirs of the original grantors.

58

The gist of the plaintiffs' petition is that the deed made by Lewis and Goodman in 1866 should be held to be void and a reverter decreed to plaintiffs on the ground of a misuser in this, to-wit: that the deed recites that the use of the property was to be limited to church purposes, and in 1910 the trustees in violation of this limitation caused the church building then on the lots to be razed and in its stead erected a combination church and twelve-story office building, known as the Grand Avenue Temple. The invalidity of the deed is alleged to consist in a violation of Sections XII and XIII, Article 1, of the 1865 Constitution of this State.

The defendants are the present trustees of this property, and the Metropolitan Life Insurance Company, which is the holder of a first deed of trust on the lots placed thereon by the trustees. Their answers are general denials, pleas of the Statute of Limitations, adverse possession, laches and estoppel.

In July, 1910, the trustees, authorized by the governing body of the church, which is the Quarterly Conference of the Grand Avenue Methodist Church, executed their note as trustees in the sum of $300,000 to the Metropolitan Life Insurance Company, payable in ten years and secured the same by giving a deed of trust on Lots 109 and 110. With this money the trustees razed the church building then on the lots and erected the combination building which consists of the church building proper, or an auditorium, and the twelve-story building. Lots 109 and 110 have a frontage of ninety-six feet on Grand Avenue and one hundred and fifteen feet on Ninth Street. The church auditorium faces on Ninth Street and occupies the larger area of the lots, i. e., it extends seventy feet on Ninth Street and runs back ninety-six feet and seats about 1400 persons. The twelve-story building occupies forty-five feet on Ninth Street by ninety-six feet on Grand Avenue. The lots are entirely covered by the combination building. These lots are in the heart of the Kansas City business district. The purpose of the erection of the new building was to provide funds from the rentals of the same to carry on the church's activities. That section of the city was rapidly being devoted to business, and less opportunities were afforded to obtain funds to defray the necessary expenses of the church. This moved the trustees, when authorized by the governing body of the church, as is said by the plaintiffs, "to center on commercializing the property" that the church organization might be there perpetuated and its activities continued.

The facts more in detail as to the use of the buildings are best shown by the testimony of the rental agent of the office building who has had charge and supervision of the same from 1917 to the time of the trial in 1925.

He testified, in effect, that the office building is twelve stories and a basement and that it is all rented to attorneys, real estate dealers,

insurance companies, manufacturers' agents, cement companies and various other secular business firms and corporations. The ground floor is occupied by stores, viz., a shoe store, typewriter store, and a haberdasher with a cigar and candy store in the lobby. The rental agent has an office on the second floor. At the time of the trial there were no religious or non-secular tenants in the building, except the pastor of the church, who had an office on the third floor. He moved in there after this suit was filed. No pastor ever had a permanent office in this building before April, 1924. There was a parsonage for the use of the pastor on these lots at the time of the removal of the old church building. The new buildings covered all of the lots, and the provision of the deed requiring the erection of a residence for the pastor was ignored.

In the basement of the office building is a kitchen which connects with the basement of the church building, and since the latter part of 1923 the Sunday School for small children has been held in the basement of the office building. This Sunday School is held in the church proper when the auditorium of the church is not in use. Since this suit was filed the roof of the office building has been used for a sunrise service on Sunday morning; this had never been done before, nor has it since been regularly continued. The equipment of the office building, such as the heating plant, distributing panel, switch board, distributing panel for electric current and vacuum machine, water-cooling apparatus, oil storage tank, water and gas meters, are all located in the basement of the office building, and serve the church building. The janitor service is entirely separate for the two buildings.

The church and the office building are constructed separately with separate foundations and walls, except a partition wall on the west side of the church adjoining the rear of the office building.

The total net receipts from the rental of the office building from 1917 to 1922, both inclusive, was $320,906.23, or a net average of $3820.31 per month.

The minutes of the Board of Trustees from November 18, 1910, to the date of the trial disclose the following activities exercised by them under the trust: The appointment and hiring of rental agents; the formulating of contracts and leases for renting office space; advising with agents upon leases of prospective tenants; executing mortgage bonds and notes; requiring the rental agent to give bond; controlling and managing the office building; making repairs; collecting rentals of same; providing a sinking fund to pay off indebtedness; endeavoring to rebate taxes and have the same reduced; employing attorneys to defend damage suits; selling mortgage bonds and setting price thereon; employing auditors; allowing and paying accounts of the expenses of the business building; borrowing money at banks; guarding against elevator accidents; paying taxes; adjusting rental differences with tenants; opposing a city license fee for conducting

a music hall; altering building to satisfy lessees; enforcing rent collections from delinquent tenants and ejecting them; selling restaurant fixtures to apply on delinquent rent; securing reductions on taxes; investigating location of interurban terminals; approval of report of "Waste Paper Committee" retrieving from janitor his emoluments therefrom; renting church auditorium for various functions; hiring workmen; investigating the cost of operating the business building; considering the employment of an agent for entire property instead of rental agent for business property; operating a failing haberdashery business; investigating accidents in office building; increasing rents and loaning money, and extending first mortgage loan.

The church or auditorium building itself has also been devoted to considerable business activities as is shown by the record of the Board of Trustees. While the church services have been kept up, the rental of the church auditorium proper for secular purposes has been done whenever it was possible. The rental of the auditorium for secular purposes assumed such proportions as to render it necessary to employ a special real estate firm to look after these rentals, which were deemed of an importance equal to the renting and management of the office building itself.

The church treasurer, by reference to his books, testified that during the years stated the amount following each year was received by him for the rental of the church building or auditorium for secular purposes: in 1924, $3722.21; in 1923, $3428.31; in 1922, $4729.26. These amounts were received during the three years he had been treasurer; that while he did not have figures for any other years, he knew that the auditorium of the church building had been rented prior to his term, and that it was open to any and all rental engagements, provided the applicants received the endorsement of a committee appointed by the trustees for that purpose.

The provisions of the Constitution of 1865, here invoked, are as follows:

"XII. That no religious corporation can be established in this State; except that by a general law, uniform throughout the State, any church, or religious society, or congregation, may become a body corporate for the sole purpose of acquiring, holding, using and disposing of so much land as may be required for a house of public worship, a chapel, a parsonage, and a burial ground, and managing the same, and contracting in relation to such land and the buildings thereon, through a board of trustees selected by themselves; but the quantity of land to be held by any such body corporate, in connection with a house of worship, or a parsonage, shall not exceed five acres in the country, or one acre in a town or city.

"XIII. That every gift, sale or devise of land to any minister, public teacher, or preacher of the gospel, as such, or to any religious sect, order or denomination, or to or for the support, use or benefit of, or in trust for any minister, public teacher, or preacher of the gospel, as such, or any religious sect, order or denomination; and every gift or sale of goods or chattels to go in succession, or to take place after the death of the seller or donor, to or for such support, use or benefit; and also every devise of goods or chattels, to or for the support, use or benefit of any minister, public teacher, or preacher of the gospel, as such, or any religious sect, order or denomination, shall be void; except always any gift, sale or devise of land to a church, religious society or congregation, or to any person or persons in trust for the use of a church, religious society or congregation, whether incorporated or not, for the uses and purposes and within the limitations of the next preceding clause of this article."

The habendum clause of the deed made by the grantors to the trustees, therein named and their successors, is as follows:

"To Have and to Hold the premises hereby conveyed with all the rights, privilege and appurtenances thereunto belonging or in anywise appertaining unto the said parties of the second part as joint tenants and not as tenants in common, and to their heirs and assigns forever, the said Lewis and Goodman covenanting to and with the said parties of the second part their heirs and assigns for themselves their heirs, executors and administrators to forever Warrant and Defend the title to the premises hereby conveyed against the claims of every person whatsoever."

The trusts and conditions of the deed as set forth in the copy in evidence under which the trust was created are as follows:

"This conveyance herein is made and executed upon the following trusts and conditions namely, that the premises aforesaid shall be used, kept, maintained, and disposed of as a place of Divine Worship for the use of the Ministry and membership of the Methodist Episcopal Church in the United States of America and as a place of residence for the use and occupancy of the Preachers of the Methodist Episcopal Church in the United States of America, who may from time to time be stationed in this place. Said place and said trusts to be subject to the directions, usage and Ministerial appointments of said Church as from time to time are authorized and declared by the General Conference of said Church and the annual conference of said Church in which bounds the same premises are situated, and the further trust and confidence that the said parties of the second part Trustees as aforesaid shall at all times permit such ministers and preachers belonging to the Methodist Episcopal Church as shall from time to time be duly authorized by the General Conference of the ministers of said Church or by the Annual Conference to preach and expound God's Holy Word, and to execute the discipline of the Church and to administer the Sacraments in said place of Divine

Worship according to the time, meaning and purport of the Deed of Settlement of said Church. That this conveyance is made for the immediate use and benefit of the Society of said Methodist Episcopal Church in the City of Kansas in said County and State, now called the Kansas City Station, and it is agreed that the quarterly conference of said Society, in Kansas City, shall have power to remove said trustees and their successors and appoint others in their stead as in the Discipline specified and to fill all vacancies that may occur in said Board, that said trustees and their successors shall yield up and give place to such trustees as may from time to time be appointed as in the Discipline specified and when said trustees or their successors or any of them cease to be Trustees for any cause all their right, title, interest, claim and demand of, in and to said Real Estate shall notwithstanding the joint tenancy and survivorship above created immediately pass to and become vested in the other trustees and said trustees and their successors and survivors or their heirs who may at any future time be the trustees of said Real Estate or a majority of them shall at all times forever hereafter have full power notwithstanding the trusts hereinbefore created to lease, mortgage, bargain and sell, transfer and convey in fee simple or otherwise the aforesaid real estate and its appurtenances whenever they may deem it necessary, proper and expedient for the best interests of the Church so to do, and to receive the proceeds of such disposition and after paying all debts and expenses due, shall deposit the remainder of the money arising from said sale or other disposition in the hands of the stewards of said Society in Kansas City, for whose immediate use and benefit this conveyance is made which money so placed in the hands of the stewards shall be at the disposal of the quarterly conference of said Society called the Kansas City Station which quarterly conference shall dispose of said money according to their best judgment for the use of said Society but in no case shall said money be taken, held or disposed of for the individual use of any of said trustees or any member of the Quarterly Conference and it is agreed by all parties hereto that this conveyance and all the foregoing trusts and conditions are and shall be subject to the rules and discipline of said Methodist Episcopal Church and the said Trustees severally agree to the foregoing trusts and conditions and covenant to assume and faithfully discharge all the duties as trustees as hereinbefore mentioned.''

The rules and regulations of the Methodist Episcopal Church, with reference to church property, as shown by its book of rules adopted by its governing body, are in effect as follows:

Section 345. The Board of Trustees shall consist of not less than three nor more than nine members.

Section 350. The Board of Trustees shall hold all church property, using so much of the proceeds as may be needful to pay debts and

to make repairs, and they shall hold all trusts coming under their control in conformity with the laws of the State.

Section 351. Trustees having charge of church property shall not prevent or interfere with the legal and proper uses of such property as intended by the laws of the church and they shall not use the property for purposes not in harmony with the law and intention for which the property was created.

Section 354. When a title cannot be held by an absolute fee the conveyance shall be made to trustees, heirs and assigns as the law of the land may require.

Section 355. Churches may incumber, sell and dispose of their real estate when deemed advantageous, in all cases observing the requirements of the law of the land.

Sections 358 and 359 concern building operations, provide that one-half the money required shall be secured or subscribed before commencing to build, and this power is limited to the building of churches.

Section 363. In all cases where church property is abandoned or no longer used for the purpose originally designed, it shall be the duty of the trustees to sell the property and pay over the proceeds to the annual conference or secure the custody of the property by such means as the law of the state may provide.

The appellants' contentions, as disclosed by their petition, may be thus summarized:

Count One: That the deed from the original grantors, Lewis and Goodman, to the predecessors of the respondent trustees was void as in derogation of the constitutional provisions cited.

Count Two: That the respondent trustees have subjected the property to uses not authorized by the trust deed, for which appellants ask a reverter of the lots to them.

Count Three asks that a resulting trust be declared in favor of the appellants because of the misuse and abandonment of the lots by the respondents.

Count Four asks injunctive relief against the respondents for a diversion of the lots from the uses authorized by the terms of the trust.

I. The inhibitions of the constitutional provisions were intended to restrict religious corporations to the quantity of land therein stated; and to prevent their acquiring, holding, using, or disposing of more land than was required for a house of public worship, a parsonage and a burial ground; and to inhibit directly or in trust any gift, sale or devise of land or goods or chattels to the persons named or any religious sect, order or denomination as in Section XIII, supra, either directly or for the support, use or benefit of the persons named. The exception to this inhibition was to render valid

"any gift, sale or devise of land to a church, religious society or congregation or to any person or persons in trust for the use of a church, religious society or congregation, whether incorporated or not, for the uses, purposes and within the limitations" of the provisions of Section XII, supra.

The fact that the Methodist Episcopal Church in Missouri is a voluntary, unincorporated association may be regarded in construing these constitutional provisions, as of minor importance. The main purpose of these provisions, regardless of the fact of incorporation, was to limit the powers of religious associations in the manner designated in the Constitution, and to confine their activities to the exercise of their purely religious functions. The exceptions to the inhibition in Section XIII demonstrate the correctness of this conclusion. In the absence of the inhibition, the purely religious activities of a church, religious society or congregation would have been so hampered and restricted as to prevent its accepting aid for its support and for the prosecution of its work, either directly or through the instrumentality of a trust created for that purpose.

A comparative analysis of the provisions of the Constitution and the deed will enable it to be determined whether the latter constitutes a valid conveyance of the lots therein mentioned. Keeping in mind the constitutional provisions, we find that while the conveyance appears, in its initial paragraph, to invest the grantees with an absolute title, the subsequent paragraphs clearly define their relation to the title to be that of trustees. They may be said, as technically definitive of their title, subject of course, to the limitations of the trust, to be in the nature of tenants by the entirety. [Oxley Stave Co. v. Butler Co., 121 Mo. 614, 638, 26 S. W. 367.] This was the rule at common law and it is not affected by our statute abolishing joint tenancy. [Sec. 2273, R. S. 1919; Stewart v. Pettus, 10 Mo. 467; McCallister v. Ross, 155 Mo. 87, 93, 55 S. W. 1027.] The right of surviving trustees is, however, not material here, except to define the nature of their holding, in view of the fact that the deed confers ample power upon the governing body of the church (which is in harmony with the rules set forth in the book of discipline), to remove the trustees and their successors and appoint others in their stead and to fill all vacancies that may occur in the Board of Trustees.

The prevailing provisions of the deed, rendered emphatic from any angle from which they may be considered, are that the purchase of the lots was for the purpose of erecting thereon a house of worship and a parsonage. The impossibility of rendering this purpose effective by the governing body of the church, evidently caused the title of the lots to be placed in trustees. Their duties and powers, while amply defined, are clearly limited to the uses and purposes prescribed in the Constitution; a recital of these powers will demonstrate that they do not exceed the constitutional limitations.

Not only were the trustees invested with the title under the conditions stated, but they were empowered "to lease, bargain, mortgage, sell, transfer and convey in fee simple or otherwise, the aforesaid real estate and its appurtenances whenever they may deem it necessary, proper and expedient for the best interest of the church." This limitation, applicable to all the authorized activities of the trustees, brings the deed within the constitutional provisions. It would have been futile when the prevailing purpose of the deed was to enable the church to provide a place of worship and a residence for a pastor, to have simply clothed the trustees with power to take title to the lots and to hold the same and not to have coupled with that power the right to take such steps as were necessary to effect the intended purpose. Those steps, as were reasonably contemplated might involve the necessity of a mortgage, a sale or a transfer of the property. provided always, that the ultimate purpose of their action was clearly within the exceptions prescribed in the Constitution (Sec. XIII).

II. Much wholly irrelevant matter has been injected into this case, both in the printed and oral arguments, to sustain the contention that the dedication of the greater portion of the lots to a purely commercial purpose was within the exercise of the powers conferred by the deed. The reason adduced in support of this conclusion is that the net proceeds of the rental of the office building is used for the support of the church in its capacity as a religious association. A review of the facts, in the express terms of the deed, does not lend color to the correctness of that conclusion. Putting aside the not infrequent letting of the church auditorium for lectures as not contravening the terms of the trust, although the evidence shows that such use is for pecuniary profit and not for religious purposes, we come to a consideration of the question as to whether the permanent setting apart of the greater portion of the property to the promotion and conduct of a business enterprise. the income of which is applied to the support of the church. may be reasonably construed as within the power conferred upon the trustees.

The conditions under which the deed was made and the trust created are that the property therein conveyed "shall be used, kept, maintained and disposed of as a place of divine worship for the ministry and membership of the Methodist Episcopal Church of the United States; and as a place of residence for the use and occupancy of the preachers of said church, who may from time to time be stationed there." The meaning of these words is unmistakable. Prolix arguments and far-fetched conclusions based thereon obscure rather than clarify their meaning. What is clear cannot be rendered more so by a multiplication of words. There can, therefore be no mistaking of the use to which the property was to be put when

the trustees, evidently under the authority of the governing body of the church, became invested with the title thereto. That use was to provide a place whereon might be erected a house of worship and a place of residence for a representative of the church to conduct religious services for a congregation. The use, definitely expressed, carries with it, under an authorized rule of interpretation, a limitation which prohibits any other use than that expressed. The powers of the trustees are to be construed subject to that limitation. If they leased, mortgaged, sold or conveyed the lots for what they deemed the best interests of the church, the ultimate purpose of their action in each instance was to perpetuate or re-establish the primary purpose of the deed, i. e., to provide a house of worship and a parsonage "for the society"—by which is meant that congregation or association then forming the particular church for whose use the lots were purchased. This is rendered more evident by the provision that if the lots are sold the proceeds of the sale are to be turned over to the governing body of the church for the use of the society.

But, it is contended that the rapid transition of that portion of the city surrounding the lots from a residential to a business section and the removal of many of the communicants of the church to other localities, rendered the continued existence of the church precarious. To prolong its life and to enable it to continue to shed the gladsome light of true religion, which each particular sect is assured that it possesses, the trustees inaugurated the enterprise which has provoked this litigation. To accomplish it, they, in 1910, removed from the lots the house of worship and the parsonage which had been in use thereon for the purposes of their erection since 1867, mortgaged the lots to an insurance company for a large sum of money and built thereon a church and an office building; from the rental of the latter it is claimed the church perpetuates its existence. It is beyond the purview of legal interpretation to descant upon the business sagacity which may be manifested by this action or the beneficent results that may have flowed therefrom. What we are concerned in is the purpose of the deed and the powers of the trustees thereunder. These, under a fair construction of their terms, lend no authority to this manner of dealing with the property. The only plea urged in support of this proceeding is necessity, which the pundits tell us knows no law. In short, the trustees, without the intervention of a court of equity, which is the distinguishing feature in Lackland v. Walker, 151 Mo. 210, proceeded arbitrarily to apply the doctrine of *cy pres* in the exercise of their powers, unmindful of the limitations prescribed in the deed.

This trust is not severable. It was created for certain well-defined purposes. Its terms do not admit of such a construction as will authorize a partial performance of those purposes as a compliance with the requirements of the trust. The erection, therefore, of a business building for rental purposes on a part of the lots and a house of

worship on the remainder of the same and the ignoring of the requirement for the erection of a parsonage thereon does not comply with the terms of the deed and consequently is not within the power conferred by the trust. In explanation of the alleged necessity for the exercise of this unauthorized power by the trustees they plead a change in conditions from those existing at the time the trust was created. While a court of equity might lend an attentive ear to a plea of this character, if properly presented, is beyond question. [Lackland v. Walker, supra.] The invoking, however, of the doctrine of *cy pres,* requisite in the presentation of such a plea, cannot be recognized in support of the action of trustees who have arbitrarily exceeded the powers conferred upon them.

The cases cited in support of the action of the trustees are not parallel in their facts with those at bar. So far as their rulings are relevant to the matter at issue they are not, in regard to a misuser, in conflict with the conclusion we have reached in the instant case

In Strother v. Barrow, 246 Mo. 241, 151 S. W. 960, it was held, as in the case at bar, that property deeded to the trustees of a church to be used and occupied for religious worship is devoted to a charitable or a pious use and that the idea of perpetuity is of the essence of the grant. The vexing question there involved was one of abandonment, and not misuser, and it was held that it was not an abandonment of a charitable or pious use for one denomination to take over by purchase the church edifice of another.

In Mott v. Morris, 249 Mo. 137, it was held, in harmony with our conclusion in the instant case, that a deed to a lot for the erection thereon of a church, constituted a dedication of the property to a charitable use, and that it could not be sold for other purposes. At bar, the right to sell was granted, but the use was perpetuated by requiring the funds derived from the sale to be applied to the purpose of the original grant.

In Dudley v. Clark, 255 Mo. 570, 164 S. W. 608, the deed there under review did not restrict the use of the property conveyed to the church trustees by stating that it was for the sole purpose of erecting thereon a house of worship. Under this state of facts the court held, evidently in the absence of this express restriction, that a sale of the property for other than a pious use was authorized. As to the right of sale of the property in the instant case there can, under the terms of the deed, be no question. Not only is the use of the same, while held by the trustees, restricted to a pious use, but if sold the proceeds are, as has been shown, to be devoted to the purpose of the original grant. This distinguishes the case at bar in this respect from Dudley v. Clark, supra.

Finally, the record enumerates some thirty or more business activities by the Board of Trustees. Many of these are incidental to the management of the office building, while others are not connected

therewith. Whether incidental or independent no authority for their exercise can be found in the deed.

III. This brings us to a consideration of the question, vital to a determination of this case, as to the effect, if any, the unauthorized exercise of the powers of the trustees has upon the rights of the plaintiffs. They sue as the heirs and the grantees of certain heirs of the grantors. The latter parted with their title to the lots for the most distinctive character of a valuable consideration, viz: money. In the use, therefore, of the lots by the grantees after the execution and delivery of the deed, the grantors have no concern. They parted with their title as completely as if no conditions or limitations had been inserted in the conveyance. Having thus divested themselves of all present or prospective right to the property a court of equity would in reason and good conscience turn a deaf ear to their prayer for a reversion of the title to them on account of the misuse or diversion of the property in violation of the terms of the trust. If a precedent were needed to sustain this conclusion it will be found in Glaze v. Allen, 213 S. W. (Mo.) 784, in which it was held, among other rulings, that the contention of the grantors for a reversion of the title under a state of facts more favorable to them than at bar, would not be sustained. In an earlier case, McRoberts v. Moudy, 19 Mo. App. 26 which was a suit by one set of trustees against another set, PHILIPS, J., learnedly discusses the difference between the right of a donor of a charity and a grantor for a valuable consideration of land for that purpose. The emphasis given in that opinion, however, to the superior rights of a grantor in a deed creating a trust, this court has repeatedly held do not exist. A gift, grant or conveyance of property for a charitable or pious use is forever; and neither the donor, nor grantor, nor their heirs nor grantees can claim a reverter of the property in the event of a violation of the terms of the trust, unless a limitation or condition in the grant or conveyance authorizes the claim. There is none in the deed here under consideration. [Glaze v. Allen, supra; Mott v. Morris, 249 Mo. 137, 146, 155 S. W. 434. Bredell v. Westminster College, 242 Mo. 317, 147 S. W. 105; Reynolds v. Reynolds, 234 Mo. 144, 136 S. W. 411; Haydon v. Railroad, 222 Mo. 126, 121 S. W. 15.]

It is scarcely necessary to say that whatever rights the plaintiffs may claim to have in these lots is purely derivative. It has been shown that the grantors themselves have no right to institute an action of the character here under consideration. It follows, therefore, that no such right can be held to exist in the plaintiffs.

In holding that there has, under the terms of the deed, been a diversion in the use of the property, we are not called upon to prescribe a remedy. This matter may be determined by the governing body of the church in a court of equity.

The absence of a right of action in the plaintiffs renders unnecessary a discussion of other questions submitted for our consideration.

The judgment of the trial court holding that the plaintiffs have no right of action is affirmed. *White, J.*, concurs; *Blair, P. J.*, concurs in paragraphs 1, 3 and the result.